**Robert Anthony REED et al., Plaintiffs,**

v.

**James A. RHODES et al., Defendants.**

**No. C73–1300.**

United States District Court,
N. D. Ohio, E. D.

May 15, 1979.

James L. Hardiman, Theresa Demchak, Cleveland, Ohio, Nathaniel R. Jones, New York City, Thomas I. Atkins, Roxbury, Mass., for plaintiffs.

Jeremiah Glassman, Michael Sussman, Dept. of Justice, Washington, D.C., for amicus curiae, United States of America.

Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, George I. Meisel, James P. Murphy, Squire, Sanders & Dempsey, John H. Bustamante, Cleveland, Ohio, for defendants.

**ORDER**

BATTISTI, Chief Judge.

The February 6, 1978 remedial order stated that "magnet schools and programs can be an important component in the desegregation process." The order highlighted the Court's concern that desegregation planning be effective in achieving satisfactory academic goals as well as in ending racial discrimination. The magnet school concept was adopted as one technique available to defendants which could be used to accomplish these two important goals.[1]

---

1. The Government is correct to point out that the use of the magnet school technique is discretionary on the part of the local defendants. However, once the defendants decide to utilize

The magnet school concept was not sufficiently defined or elaborated in the February 6, 1978 order. The order set forth the obligation of defendants to develop a comprehensive plan for magnets to insure that if magnets were attempted, they would "mesh with other aspects of desegregation, in particular pupil assignment, school closings, transportation, and finances." The order, however, did not specify the content or structure of magnet programs except for a reference to the location of magnet facilities.

■ Magnet school programs can be an educationally sound way to minimize the impact of desegregation. If thoughtfully developed, a school district can improve and broaden its curricular offerings and thereby provide exciting alternatives to the traditional format and subject matter. A magnet school program created in the midst of desegregation planning must operate, first and foremost, to achieve the proper racial balance required of all schools in the system. The magnet school, however, is different from the non-magnet school because its student body is determined by the voluntary choice of the students and parents. The magnet schools, therefore, must incorporate either a style of teaching or an educational focus which provides a meaningful alternative to the traditional curriculum and method of teaching in the rest of the system. The method of selection of students and the location of the school must be devised to attract the appropriate racial composition to pass constitutional muster.

A comparison of magnet programs from throughout the country shows that magnet schools have accomplished a number of educational goals. For example, they have provided an opportunity to teach the basic curriculum with greater attention to particular learning problems and to individual aptitude, e. g. Montessori programs. Also, they have offered a special substantive focus around which the basic curriculum has

been targeted, e. g., a business magnet, a health science magnet. In almost all cases, despite the school's particular special program or focus, the school has provided a sufficiently diverse educational background to prepare a student for a variety of career opportunities. The student's post-secondary school mobility would, thereby, be enhanced and not impaired by his participation in a magnet school program.

The Cleveland Board believes that an accurate definition of magnet schools is contained in the regulations promulgated by the Office of Education of the Department of Health, Education and Welfare relating to the Emergency School Aid Act. The definition is contained in Subpart k, section 185.01 which provides as follows:

" 'Magnet school' means a school or education center that offers a special curriculum capable of attracting substantial numbers of students of different racial backgrounds.

" 'Special curriculum' means a course of study embracing subject matter or a teaching methodology that is not generally offered to students of the same age or grade level, and in the same local education agency, as the students to whom the special curriculum is offered. This term does not include—

"(1) A course of study or a part of a course of study designed solely to provide basic educational services to handicapped students or to students of limited English speaking ability; or

"(2) A course of study or a part of a course of study in which any student is unable to participate because of his or her limited English-speaking ability; or

"(3) A course of study or a part of a course of study in which any student is unable to participate because of his or her limited financial resources; or

"(4) A course of study or a part of a course of study which fails to provide for

---

magnet programs, they must be reviewed and approved by the Court. Also, because magnet schools require the reassignment of students from neighborhood and paired schools, a comprehensive magnet plan must be drafted and

approved prior to implementation of any part of the remedial decree. Otherwise, the students could be subjected to multiple transfers which might impair the effectiveness of the overall desegregation plan.

a participating student's meeting the requirements for completion of elementary or secondary education in the same period as other students enrolled in the applicant's schools."

■ The Court hereby adopts the H.E.W. definition 45 C.F.R. §§ 185.101–102 with the following exceptions and additions. First, the eligibility description in the regulations defines the phrase "substantial numbers of students of different racial backgrounds" to mean a student body composition in each magnet school of at least 20% minority group students and no more than 50% minority group students. This range is too broad for the Cleveland public schools. The Court has been informed that the current racial balance of the district as a whole is approximately 35% white and 65% black. Deposition of Margaret Fleming, February 13, 1979. The February 6, 1978 plan provided that all schools in the district must either match this particular ratio or be within a reasonable deviation from it. This mandate is equally applicable to the magnet schools. A fifteen percent deviation from the percent ratio of the district as a whole is the maximum deviation that would be reasonable. Therefore, the standard required for Cleveland, at some point, may not fall within the H.E.W. guidelines.[2] At that point, as always, the February 6, 1978 order and the guideline contained therein will supercede the racial balance contained in the H.E.W. regulations.

Second, the H.E.W. definition emphasizes that a magnet school is a distinct educational concept because it attracts students from different racial backgrounds to a school or facility other than the one to which they are normally assigned. The method of inducement, of course, is the quality and uniqueness of the special program provided. The concept relies on the voluntary choice of the students and parents. Under "eligibility", the H.E.W. regulations interpret the phrase "capable of attracting substantial numbers of students" to mean that a school

district "does not compel any student to enroll in the magnet school for any part of the grant period." 45 C.F.R. Sec. 185.102. This eligibility standard is capable of two readings. On the one hand, it might be construed that a school district may not require a student to initially enroll in a magnet school program. This construction seems proper because it preserves the basic attribute of free choice. On the other hand, the eligibility standard is, perhaps, susceptible to a different interpretation which is unacceptable. The phrase "for any part of the grant period" may be interpreted to give the student the continuing option of electing not to participate in the program— even after the student initially has enrolled in the magnet school. This interpretation could have the fatal consequence of disruptive transfers in the middle of the school year. Such transfers would affect not only the stability of the magnet program but also of the pairing or other reassignments that are part of the desegregation remedy. The prospect of intra-term dislocations is unacceptable. Consequently, administrators must inform parents and students that the choice of entering a magnet program commits the student to the program and the school assigned for the school year. The assigned magnet school would become the home school for the student and any requested transfer from this school would have to comply with the special transfer policy and procedure approved by this Court.

Third, the Court will review a specific magnet school proposal only after a comprehensive magnet school plan has been submitted and approved by the Court. The comprehensive plan must set forth all such programs anticipated for the 1979–80 and 1980–81 school years. The plan and any specific proposals must detail the location of the school sites, the reason these sites were chosen, the likelihood that the site will attract students of different races, the educa-

---

2. The literal wording of the H.E.W. regulations leads to the incredible conclusion that magnet programs which are constitutional may remain unfunded, yet magnet programs which violate the constitutional mandates in the desegregation case in a district like Cleveland receive the benefits of the federal purse.

tional uniqueness of each specific program, the need for such program, and the input received by parents and community groups which helped formulate the plan or program. Also, the plan and any specific proposal shall contain at least two thorough, independent evaluations of the efficacy, quality and preparation of the plan or proposal written by desegregation experts who are presently not employed by the local school district.

Fourth, in order to assure that the magnet programs meet the criteria laid out above, a magnet school program will only be provisionally approved until such time that the school district provides the court with a final list of names and races of the students assigned to each magnet school. Final approval would then be considered. In order to avoid confusion and delay, therefore, the school district must publicize and receive applications for the program well in advance of the start of the school term, but not less than 45 days before the term begins. The school district must submit the list of names and races no later than 40 days before the school term is scheduled to begin.

The definitions contained in 45 C.F.R. §§ 184.101–102 are hereby approved with the exceptions, supplementations and the spirit explained above.

If the defendants decide to undertake any magnet programs, they are hereby ordered to submit their final and complete comprehensive magnet school plan for 1979–80 on or before June 29, 1979. Moreover, they are to submit a report which describes the manner in which the school board intends to explain the various options to the students and parents and to counsel them in their decision making. This report shall be filed on or before June 29, 1979.

The February 6, 1978 order is hereby modified to the extent that it is consistent with this order.